Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| S.F., and E.F., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, and the SLALOM LLC. HEALTHCARE BENEFIT PLAN. <br><br> Defendants. | COMPLAINT <br><br> 1:22-cv-00068 - DBP <br><br> Magistrate Judge Dustin B. Pead |

Plaintiffs S.F. and E.F., through their undersigned counsel, complain and allege against Defendants Cigna Health and Life Insurance Company ("Cigna") and the Slalom LLC. Healthcare Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. S.F. and E.F. are natural persons residing in King County, Washington. S.F. is E.F.'s father.

1

2. Cigna is an insurance company headquartered in Bloomfield, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). S.F. was a participant in the Plan and E.F. was a beneficiary of the Plan at all relevant times. S.F. and E.F. continue to be participants and beneficiaries of the Plan.

4. E.F. received medical care and treatment at Catalyst Residential Treatment Center ("Catalyst") from January 3, 2020, to September 18, 2020. Catalyst is a licensed treatment facility, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Catalyst is located in Box Elder County, Utah.

5. Cigna, acting in its own capacity or through its subsidiary and affiliate Cigna Behavioral Health, denied claims for payment of E.F.'s medical expenses in connection with his treatment at Catalyst.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Slalom LLC, the sponsor of the Plan, has a business office in Utah and the Plan provides benefits to Utah employees and their dependents. In addition, Cigna has business offices in Utah and the treatment at issue took place in Utah.

8. In addition, S.F. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.F.'s Developmental History and Medical Background

10. In the fall of 2017, E.F. began seeing a therapist due to ongoing struggles with depression. In December of 2017, E.F. confided to his school counselor that he was considering suicide. E.F. confessed that he had already attempted suicide by hanging in a nearby park, but the branch he had used broke under his weight.

11. E.F. started meeting with a psychologist and was put on suicide watch. Shortly afterwards on December 7, 2017, E.F. left school without permission (even though school officials were supposed to keep a close watch on him due to his mental state and recent suicide attempt) and consumed a large quantity of alcohol. When he returned, school staff took

notice of his inebriated state and suspended him for three days. E.F. then began meeting with a substance abuse specialist.

12. E.F. appeared to stabilize, at least for a time, and was again able to participate in activities like baseball. On September 22, 2018, S.F. was woken up by a knock from a police officer who informed him that E.F. and his friends had been outside at night and the police were called on them due to their dangerous and erratic behaviors. The officer told S.F. that E.F. had subsequently been hospitalized for a drug overdose.

13. E.F. continued to use drugs to cope with his depression although, when confronted, he would deny any drug use. E.F. was caught with marijuana and was forced to attend a substance abuse program. S.F. began drug testing E.F. multiple times a week, but this had the end result of E.F. seeking out harder drugs which were less likely to show up on his drug tests. E.F. also cheated the tests by using "clean" urine which he carried with him in a bottle.

14. On May 22, 2019, E.F. was expelled from school and charged with drug possession with intent to sell after a very large quantity of marijuana was discovered in his car. On August 24, 2019, E.F. got drunk and high with friends and had to be restrained by S.F. when he attempted to get into his car to drive away. E.F. became very angry and threatened suicide and was taken to the emergency room for a psychological evaluation.

15. E.F. was discovered to have an opioid addiction and was placed in group therapy. He was frequently very combative and would often threaten his family and friends. E.F. would often express remorse for his behaviors afterward but continued to go through the same cycle of aggression again and again. E.F.'s behaviors became so extreme that his little sister felt unsafe and moved out of the house to stay with a family friend.

16. E.F. would punch holes in the walls, threaten suicide, and continued to abuse drugs and alcohol. He broke the front door and threatened to run away from home and never come back. On September 28, 2019, E.F. stated that he was going to the homecoming dance but was later found by the police unresponsive in his car. Officers had to break the window and he was rushed to the hospital by paramedics.

17. E.F. was suffering from lung failure brought on by his substance abuse including THC, cocaine, and Percocet. E.F. was not receiving oxygen to his brain and had to be intubated. E.F. then spent three days in the intensive care unit. E.F. later admitted that this had been another suicide attempt.

18. Shortly after E.F. got home he attempted to break into a locked safe in the house to obtain some prescription painkillers. He was caught by S.F. and admitted that he had once again been attempting suicide. E.F. was admitted to an outdoor behavioral health program called Open Sky the next day on October 5, 2019.

## Catalyst

19. E.F. was admitted to Catalyst on January 3, 2020, following his discharge from Open Sky.

20. In a letter dated January 6, 2020, Cigna denied payment for E.F.'s treatment at Catalyst. The reviewer gave the following justification for the denial:

> The clinical basis for this decision is: Based upon the available information, your symptoms do not meet the Cigna Behavioral Medical Necessity Criteria for Residential Mental Health Treatment for Children and Adolescents for admission and continued stay from 01/06/2020[1] forward, as you are not reported to be voicing thoughts of harm to self or others. You are not reported to be exhibiting aggressive behavior or disordered thinking. There is no co-occurring severe

---

[1] The reviewer appears to have substituted the date the letter was drafted for the dates of service which were denied. Other portions of the letter make it clear that the reviewer intended to deny payment from January 3rd forward not from January 6th forward.

> functional impairment requiring 24-hour supervision. You are medically stable. You have a supportive family. Less restrictive levels of care are available to assist you to learn healthy coping skills, and for medication management.

21. On June 29, 2020, S.F. submitted an appeal of the denial of payment for E.F.'s treatment at Catalyst. He again reminded Cigna of its responsibilities under ERISA, and its obligation to act in his best interest and conduct a full, fair, and thorough review of the denial. He asked Cigna to provide him with a physical copy of all documentation related to the initial decision and the level one appeal determination, including any internal case notes.

22. S.F. argued that residential treatment was necessary for E.F. given his history of depression, substance abuse, suicidal ideations, and suicide attempts, as well as the recommendations of his treatment team. S.F. included letters of medical necessity with the appeal. In a letter dated April 7, 2020, E.F.'s psychologist Masaki Yamada, Ph.D. wrote in part:

    > This letter is to request collaborative effort and provide supporting information regarding the medical necessity for [E.F.] to have a higher level of treatment which included a wilderness therapy program and subsequent residential treatment.
    >
    > [E.F.] was a patient in my care from 2016 – 2019. He was being treated for depression and high anxiety. He began to emotionally decline and his ability to function was severely compromised. This was evidenced in the decline in his grades, social relationships, and eventually drug and alcohol problems. In the summer of 2019, his functioning declined to the point where police had to intervene, and he required hospitalization on three occasions. It was determined that [E.F.] could not be safely and effectively treated in the community living at home. He had decompensated and the decision to support a more structured treatment environment was evident and supported by multiple professionals. It was decided that the risk of trying to treat him in the community was too high regarding keeping him safe as he was very vulnerable to further regression and relapse and spiraling out of control. I was in support of the decision for a wilderness treatment program and subsequent residential treatment to provide the best chance for recovery. He had exhausted community treatment options and

clinically and ethically, a higher level of treatment was the appropriate treatment for him.

E.F.'s pediatrician Kathy Risse, MD wrote in part in a letter dated April 23, 2020:

> Given the persistence of [E.F.]'s symptoms over the years, with increasing severity and escalation to a suicide attempt and ICU admission, and despite continued intensive outpatient therapy and medication monitoring, a more intense level of treatment became necessary. [E.F.]'s family and therapeutic team could no longer keep him safe at home. A residential level of care was necessary to achieve significant and lasting improvement of [E.F.]'s conditions. I consider this to have been a medically necessary course.

In a letter dated April 20, 2020, Chris Harnish, BA, CDP, CC, CPP, wrote in part:

> Despite his involvement in less restrictive treatment modalities including; ongoing outpatient therapy, the use of medication therapy as well as school based supports, [E.F.] continued to struggle to regulate his emotions and when in crisis utilized substances as an unhealthy coping mechanism. It is my belief that [E.F.] uses substances to mask his emotions, which has resulted in negative impacts on his education, legal standing and mental health which ultimately, almost took his life after the overdose in September. It is my opinion that a long term therapeutic boarding program is necessary for [E.F.]'s safety and would allow him to learn the skills needed to deal with his emotions and make long lasting changes. I fully support the recommendation of residential treatment.

In a letter dated April 26, 2020, Hower Kwon, MD., wrote in part:

> Because of the severity of his symptoms, including a near fatal overdose, his parents decided to enroll him into a wilderness program and then subsequently a longer-term rehabilitation program. I am in full agreement of the need for the intensity of those interventions given the severity of symptoms, lack of responsiveness to less intensive modes of treatment and the severity of his near fatal overdose.

In a letter dated May 20, 2020, educational consultant Kristin Kajer-Cline wrote in part:

> Based upon comprehensive interviews with parents, mental health professionals and others in his life, and an extensive review of medical and cognitive evaluations, academic records and testing data, it was my professional belief that placement in a residential treatment environment was medically necessary for [E.F.]'s emotional and physical wellbeing and for the safety of others. Following an extensive review of appropriate therapeutic options, I recommended that he be placed at Open Sky Wilderness Therapy…

> During [E.F.]'s time at Open Sky Wilderness Therapy I consulted weekly with his primary therapist, and together we concluded that [E.F.] needed placement following wilderness therapy in a secure residential treatment environment. [E.F.] needed this second placement in order to further solidify and practice the skills he was learning, and to assure sustainable changes in behavior. One of the residential treatment options I presented to the family was Catalyst Residential Treatment Center. I recommended this program primarily due to their specialization in co-occurring substance abuse and mental health treatment and their added ability to provide academic support specific to his diagnosed learning differences. Both Open Sky and Catalyst were well suited to meet [E.F.]'s clinical needs as they provided intense individual therapy, group therapy, family therapy, social pragmatics work, and specific therapeutic support for his substance abuse and depression.

Jonathan Mitchell, MA, LPC, wrote in part in E.F.'s discharge summary from Open Sky:

> It is recommended that [E.F.] attend a Residential Treatment Center to support continued growth and success. [E.F.]'s parents chose Catalyst Residential Treatment, LLC.

23. S.F. contended that E.F.'s treatment was offered in accordance with the unanimous professional opinions of the members of his treatment team. He asked Cigna to elaborate on what basis it felt it could supersede the opinions of E.F.'s clinicians who had worked with him on a firsthand basis and actively witnessed the deterioration of his condition.

24. S.F. wrote that lower levels of care had been repeatedly attempted but had been unsuccessful in treating E.F. He wrote that the criteria used by Cigna to deny care were flawed and, in any event, appeared to have been applied improperly. S.F. quoted Cigna's residential treatment admission criteria and noted that there was no requirement of acute level symptoms in these criteria, even though Cigna had used acute symptoms as a justification to deny payment in its denial letters

25. To evidence this, S.F. quoted the language of the initial Catalyst denial letter, including the statement that E.F. was "not reported to be voicing thoughts or harm to self or others." S.F. asserted that Cigna had disregarded the requirements of its own criteria and

had denied payment based on factors which it never listed as prerequisites. He argued that E.F. also met the Plan's definition of Medical Necessity as well as Cigna's continued stay criteria, which also contained no acute level requirements.

26. S.F. requested that Cigna perform a parity compliance analysis of the Plan and provide him with physical copies of the results of this analysis.

27. S.F. asked in the event that Cigna upheld the denial that it provide him with a copy of all documents under which the Plan was operated including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination as well as their medical or surgical equivalents (regardless of whether these were used to evaluate the claim), any reports or opinions concerning the claim from any physician or other professional, and the names, qualifications, and denial rates of all individuals who reviewed or were consulted about the claim. (collectively the "Plan Documents").

28. S.F. asked in the event Cigna was not in possession of these documents or was not acting on behalf of the Claims Administrator in this regard that it forward his request to the appropriate entity.

29. In a letter dated July 31, 2020, Cigna upheld the denial of payment. The letter stated in pertinent part:

> Based upon the available clinical information received initially and with this appeal, your symptoms did not meet Behavioral Health Necessity Criteria for admission and continued stay at Residential Mental Health Treatment for Children and Adolescents level of care from 01/03/2020 - 01/03/2021.[2] Though you had symptoms of anxiety and depression, and at times struggled with

---

[2] E.F. was discharged from Catalyst on September 18, 2020.

9

> emotional regulation, you did not have impairments in functioning across multiple settings that clearly [sic]
> demonstrated a need for monitoring and intervention at a 24 hour Residential Mental Health Treatment level of care for your safe and effective treatment. You were in behavioral control, and had not recently demonstrated actions or made serious threats of harm to yourself or others as a result of a mental health disorder. Less restrictive levels of care were available for safe and effective treatment. Therefore, the initial determination is upheld.

30. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

31. The denial of benefits for E.F.'s treatment was a breach of contract and caused S.F. to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

32. Cigna failed to produce a copy of the Plan Documents or the other documentation S.F. requested, including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities, or the notes of its reviewers.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

33. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

34. Cigna and the Plan failed to provide coverage for E.F.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

35. ERISA also underscores the particular importance of accurate claims processing and

evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

36. The denial letters produced by Cigna do little to elucidate whether Cigna conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in S.F.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

37. Cigna and the agents of the Plan breached their fiduciary duties to E.F. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.F.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.F.'s claims.

38. The actions of Cigna and the Plan in failing to provide coverage for E.F.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

39. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna's fiduciary duties.

40. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

41. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

42. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

43. The medical necessity criteria used by Cigna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

44. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.F.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

45. For none of these types of treatment does Cigna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

46. When Cigna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

47. Cigna and the Plan evaluated E.F.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

48. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Cigna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that E.F. received. Cigna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Cigna's denial letters such as its assertion that E.F. had not "recently demonstrated actions or made serious threats of harm to yourself or others."

49. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that E.F. received.

50. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

51. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

52. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

53. In addition, the level of care applied by Cigna failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

54. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

55. S.F. included letters of medical necessity which clearly and repeatedly stated that E.F. "could not be safely and effectively treated in the community living at home." In spite of this, Cigna gave no indication of why its reviewers contradicted the medical professionals who had treated E.F. in person, all of whom emphatically recommended that he receive treatment at the residential level of care.

56. In addition, Cigna denied payment for E.F.'s treatment in part because E.F. had not "clearly demonstrated" a need for active treatment in a 24-hour setting. The requirement

that E.F. "clearly demonstrate," as opposed to showing by a preponderance of the evidence available, that the treatment E.F. received was medically necessary reveals a significant disparity concerning the documentation required for approval and payment of mental health services versus what is required to obtain approval and payment of comparable medical or surgical services.

57. The actions of Cigna and the Plan requiring conditions for coverage that do not align with generally accepted standards of care for treatment of mental health and substance use disorders violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

58. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

59. Cigna and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that Cigna and the Plan were not in compliance with MHPAEA.

60. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

61. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for E.F.'s medically necessary treatment at Catalyst under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 20th day of May, 2022.

By    <u>s/ Brian S. King</u>
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
King County, Washington.